IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID DICIO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 15-676 |
| | ) | Judge Fischer |
| WELLS FARGO BANK, N.A., and SCOTT | ) | Magistrate Judge Mitchell |
| PETERSON, | ) | |
| Defendants. | ) | |

I.    Recommendation

It is respectfully recommended that the motion to dismiss the Amended Complaint filed

by the Defendants (ECF No. 16) be denied.

II.    Report

Plaintiff, David DiCio, brings this action under Pennsylvania law alleging that

Defendants, Wells Fargo Bank, N.A. (Wells Fargo) and its employee, Scott Peterson, committed

acts of negligent misrepresentation, civil conspiracy, concerted action and fraud when they

supplied false financial information about one of the bank's accounts and Plaintiff relied upon

this false information and suffered damages as a result.

Presently submitted for disposition is a motion to dismiss the Amended Complaint, filed

by the Defendants.  In addition to contending that the allegations do not state a claim upon which

relief could be granted against either Defendant on any claim, they also argue that the claims

against Peterson should be dismissed for lack of personal jurisdiction and lack of service of

process.  For the reasons that follow, the motion should be denied.

Facts

On or around May 11, 2009, Plaintiff sent $240,000.00 via wire transfer to Wells Fargo

Account No. xxxxxx8902 (the "Account").  The Account was designated and/or considered a

"Special" Account by Wells Fargo and was held in the name of Molecular Diagnostics and Therapeutics, Inc. ("MDTI"). Two other individuals deposited money on or around the same time for a total balance in the Account, at inception, of $600,000.00. Plaintiff believes these were the only deposits ever made into the Account. (Am. Compl. ¶¶ 9-12.)[1]

Malcolm Benedict ("Benedict"), who was the President of MDTI, had signing authority over the Account, and had a longstanding business relationship with Wells Fargo and its agent Peterson. While Benedict had authorization over the Account, it was understood that the funds in this "Special" Account would only be used in accordance with the express consent of Plaintiff and the other Account contributors. More specifically, the Account was only to be used for the purchase of cyclotrons, which would be housed in production labs and used in MDTI's operations as a manufacturer of nuclear medicine. There was to be minimal to no activity with respect to the Account until the cyclotrons were identified and necessary licenses to transport and install the cyclotrons were obtained. (Am. Compl. ¶¶ 13-15.)

All other funds required by MDTI in conjunction with the development of the production labs, including, without limitation, costs of acquiring and renovating the facilities, licensing and transportation fees and working capital, were to be raised by MDTI through its funds sourcing and procurement operations. It was understood that the purchase of cyclotrons and obtaining the licenses needed for nuclear equipment and transportation would take an extended period of time and, thus, the $600,000.00 was to remain dormant in the Account until such time as the cyclotrons could be located, approved and purchased. (Am. Compl. ¶¶ 16-17.)

Plaintiff and the other account contributors were led to believe and understood that dormant accounts at Wells Fargo would typically only issue statements quarterly or annually,

---

[1] ECF No. 11.

depending upon the amount of activity with the account. Further, Plaintiff and the other Account contributors justifiably believed, and were led to believe, that the Account was and would remain dormant unless and until they authorized any use of the Account's funds. (Am. Compl. ¶¶ 18-19.)

Plaintiff alleges that, after he and the other Account contributors deposited their funds, and without their consent, Benedict began improperly using the Account funds for personal and/or unauthorized uses and hiding those unlawful acts from him and the other Account contributors. He also alleges that Wells Fargo, through its agent Peterson, had knowledge of, benefited from and/or participated with Benedict in the unlawful use of the Account funds, and acted in concert with Benedict in concealing and prolonging the willful misappropriation of Account funds. (Am. Compl. ¶¶ 20-21.)

In early November, 2009, Plaintiff and the other Account contributors requested that Benedict provide them with assurances regarding the safety of the funds in the Account. They did not have any reason to believe that the funds were being misused, but were merely requesting assurances as a precautionary measure. Plaintiff alleges that Benedict enlisted the aid of his personal banker, Defendant Peterson, as agent for Wells Fargo, to assist with and/or to conceal the misappropriation of the Account funds. In collusion with or acting alongside Benedict, Peterson sent an official Wells Fargo letter on or around November 4, 2009, in response to Plaintiff's inquiry, falsely stating the balance of the Account as $600,000.00 (the "First WF Letter"), thus assuring Plaintiff and the other Account contributors that the funds in the Account were safe and sound. (Am. Compl. ¶¶ 26-29.) See Peterson Aff. ¶ 20 & Ex. A-1.[2]

Benedict and Peterson also called Plaintiff from Peterson's office to inform him

---

[2] ECF No. 17 Ex. A.

that the First WF Letter was sent via overnight mail to him and to another Account contributor, Peter Ren ("Ren"), at their addresses in Pennsylvania.  Plaintiff indicates that Wells Fargo bank statements he obtained on December 10, 2012 confirm the balance in the Account was only $351,882.75 on November 4, 2009 when Wells Fargo, through its agent Peterson, sent the First WF Letter stating the balance as $600,000.00.  (Am. Compl. ¶¶ 30, 32.)

Further, $75,000.00 remained on the line of credit Plaintiff provided to MDTI at the time Wells Fargo sent the First WF Letter. These remaining funds were drawn down by MDTI after November 4, 2009, but prior to Plaintiff's receipt of the actual Account statements and discovery of the herein described fraud and misrepresentations.  (Am. Compl. ¶ 33.) Plaintiff alleges that, had Peterson not falsified the Account value on November 4, 2009, he would have discovered the unauthorized and unlawful use of the funds on such date, and could have preserved the remaining funds in the Account and refused MDTI's requests to draw the remaining $75,000.00 of the accounts receivable line of credit.  (Am. Compl. ¶ 36.)  Plaintiff alleges that he and the other Account contributors justifiably relied on the First WF Letter and believed all of their money was safe in the Account with Wells Fargo.  (Am. Compl. ¶ 37.)

On or around December 2009, Plaintiff and the other Account contributors authorized MDTI to utilize $50,000.00 of the Account's funds as an initial down payment for the first cyclotron.  This was the only money that was ever authorized to come out of the Account.  A few months after approving the down payment for the first cyclotron, Plaintiff and the other Account contributors sought additional assurances from Wells Fargo regarding the balance of the Account to ensure that it contained $550,000.00.  (Am. Compl. ¶¶ 38, 40.)

Plaintiff alleges that, in response to these inquiries, Peterson, in collusion with or acting alongside Benedict, sent a second, official Wells Fargo letter to him and Ren on or around April

8, 2010 (the "Second WF Letter") at their addresses in Pennsylvania, which falsely stated the Account balance as $550,000.00. (Am. Compl. ¶ 41.) Plaintiff questioned the language used by Peterson in the Second WF Letter, which prompted Peterson to send a third, official Wells Fargo letter, this time via e-mail, to him and Ren (the "Third WF Letter"). The Third WF Letter was also dated April 8, 2010, but it contained slightly different language than the Second WF Letter. (Am. Compl. ¶ 42.) See Peterson Aff. ¶ 20 & Ex. A-1.

Plaintiff and Ren questioned the authenticity of the Third WF Letter because, unlike the first two letters which they received originals of in the mail, the Third WF Letter was sent via e-mail and the Wells Fargo logo was not apparent in the background of the Third WF Letter. By e-mail dated April 19, 2010, Defendant Peterson assured Plaintiff and Ren that the Third WF Letter was authentic and explained that the Wells Fargo logo simply failed to scan properly. See Peterson Aff. ¶ 20 & Ex. A-1. Peterson offered to provide an original of the Third WF Letter. (Am. Compl. ¶¶ 43-44.)

But Wells Fargo bank statements for the Account that Plaintiff obtained on December 10, 2012 confirmed that the balance in the Account was only $45,445.84 on April 8, 2010 when Peterson sent the Second WF Letter and Third WF Letter, both misrepresenting the Account balance as $550,000.00. (Am. Compl. ¶ 46.) Plaintiff believes that Defendant Peterson also assisted Benedict and/or MDTI in securing loans from Wells Fargo, which loans would have been jeopardized had misuse of the Account funds been revealed. Peterson continued to benefit after sending the First WF Letter by being the business specialist overseeing the MDTI accounts with Wells Fargo. (Am. Compl. ¶ 48.)

After approving the down payment for the first cyclotron and confirming the Account balance with Peterson in April, 2010, Plaintiff and the other Account contributors were informed

that Benedict was pursuing $3,000,000.00 in venture capital funding as planned. The additional venture capital funding was necessary in order to prepare and open an additional MDTI facility in Longmont, Colorado. MDTI already had an operational facility in Diamond Hill, Colorado, which housed a single cyclotron and was used for production only. The new Longmont facility was supposed to be a full patient care facility and had to be properly prepared to house three cyclotrons, a laboratory, a clean room, patient rooms and corporate offices. The process of locating and renovating the Longmont facility and obtaining the necessary venture capital funding was expected to take many months. After MDTI decided on an appropriate location in Longmont, Colorado, Plaintiff traveled to Colorado in October, 2010 to tour both the Diamond Hill facility and the newly acquired Longmont facility. At that time, the Diamond Hill facility was fully operational, but the Longmont facility was in warehouse condition having been recently acquired. Benedict provided Plaintiff with a copy of the floor plan for the Longmont facility during this trip. (Am. Compl. ¶¶ 49-55.)

Benedict began the build out of the Longmont facility in late 2010. It was anticipated that Benedict would continue to raise funds and renovate the Longmont facility over the next 8-12 months. Benedict sent photographs to Plaintiff on a regular basis between December, 2010 and June, 2011 showing progress of the renovations at the Longmont facility. During this time, the facility was prepared to receive and house the cyclotron. The cyclotron was delivered to the Longmont facility in June, 2011. At this point, the Longmont facility still needed to be renovated for production use and patient facilities. In August, 2011, Benedict updated Plaintiff and the other Account contributors in writing as to the status of the Longmont facility and projected the facility to be fully operational by the end of 2011. (Am. Compl. ¶¶ 56-59.)

In November, 2011, Benedict indicated to Plaintiff that he needed to raise additional

funding in order to complete the Longmont facility. MDTI circulated a Private Placement Memorandum in February, 2012 in an effort to raise additional funding for the Longmont facility. MDTI made regular, timely payments to Plaintiff on the line of credit through February, 2012; and Plaintiff believed that the money he deposited with MDTI to secure cyclotrons was safe in the "special" Account with Wells Fargo all during this time. (Am. Compl. ¶¶ 60-62.)

In March, 2012, Plaintiff learned that MDTI was having financial problems. He had no reason to think MDTI was in financial distress until that time and, even thereafter, he believed that MDTI was diligently pursuing additional funding to complete the Longmont facility. MDTI stopped making line of credit payments to Plaintiff in March, 2012 and never repaid the $75,000.00 drawn on the line of credit after Defendants falsified the Account balance. (Am. Compl. ¶¶ 63-64.)

In October, 2012, Plaintiff learned that MDTI defaulted on its lease for the Diamond Hill facility. He and others made attempts to stabilize MDTI, but the company ultimately filed bankruptcy on or about November 28, 2012. Benedict filed personal bankruptcy shortly thereafter. (Am. Compl. ¶¶ 65-66.)

Following MDTI's bankruptcy filing, Plaintiff was able to obtain copies of the bank statements for the Account on December 10, 2012. This was the first time he and the other Account contributors learned that the Account funds had been depleted and, even more shockingly, that Wells Fargo and Peterson were involved with Benedict and had lied about the Account balance on multiple occasions. (Am. Compl. ¶¶ 67-68.)

Plaintiff alleges that, had Peterson not falsified the Account value on November 4, 2009 and, then again, on April 8, 2010, he would have discovered the unauthorized and unlawful use

of the funds and would have had an opportunity to protect the remaining funds in the Account and to shut down the line of credit. (Am. Compl. ¶ 72.) He alleges that the additional funds loaned to MDTI through the accounts receivable line of credit were also held in a Wells Fargo account and, as such, Wells Fargo received a direct benefit from Peterson's misrepresentations regarding the value of the Account, that the actions of Peterson, Wells Fargo and Benedict were intentionally implemented to deceive him and others and to conceal the misuse of Account funds and Peterson's misrepresentation of the Account balance. (Am. Compl. ¶¶ 73-74.)

Plaintiff alleges that the actions of Wells Fargo and Peterson were in violation of, inter alia, the following state and federal laws:

(a) 18 U.S.C. § 1005 stating, in pertinent part, that it is a federal crime to make "any false entry in any book, report or statement of such bank, company, branch, agency, or organization with the intent to injure or defraud…any individual person;"

(b) 18 U.S.C. §§ 1341 and 13433 by using the United States Postal Service and/or electronic mail as means of executing the above scheme or artifice to defraud him;

(c) 7 P.S. § 107 (a Pennsylvania statute) by maintaining a false account of the Account's assets, which is a crime under 7 P.S. § 2102; and

(d) C.R.S 11-107-105(b) (a Colorado statute) by concealing the transactions occurring in the Account and by making the above described false and/or misleading statements. (Am. Compl. ¶ 76.)

Plaintiff alleges that Peterson was in the employ of Wells Fargo as a "Business Specialist" and was charged with oversight of the Account and other MDTI accounts with Wells Fargo; that he was an "affiliate" of Wells Fargo as defined by Section 102 of the Banking Code of 1965 [7 P.S. §102], and acted as an agent of and within the scope of his authority with Wells

Fargo; and that Wells Fargo is also liable for the herein described acts of Peterson by virtue of the doctrine of respondeat superior. (Am. Compl. ¶¶ 77-79.)

Finally, Plaintiff alleges that, because Wells Fargo and Peterson acted in furtherance of a conspiracy and/or in concert with Benedict's scheme to defraud him, and took affirmative measures to conceal the same, the Defendants are jointly and severally liable for all of his damages. (Am. Compl. ¶ 80.)

<u>Procedural History</u>

On March 26, 2015, Plaintiff filed this action in the Court of Common Pleas of Allegheny County, Pennsylvania. On May 22, 2015, Defendants filed a notice of removal, removing the action to this Court on the basis of diversity of citizenship jurisdiction. They indicated that: 1) Plaintiff is a Pennsylvania citizen; 2) Peterson is a citizen of Colorado and Wells Fargo is a citizen of South Dakota; and 3) the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00. (Notice of Removal ¶¶ 12-13.)[3]

On May 29, 2015, Defendants filed a motion to dismiss (ECF No. 4.) In response, Plaintiff filed an Amended Complaint on June 19, 2015 (ECF No. 11) and on June 22, 2015, the motion to dismiss was dismissed as moot (ECF No. 12). The Amended Complaint alleges claims of civil conspiracy (Count I), concerted action (Count II), fraud (Count III) and negligent misrepresentation (Count IV). Plaintiff alleges that he deposited $240,000 into the Account and provided a line of credit in the amount of $300,000 and that these funds were misappropriated. Thus, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

On July 23, 2015, Defendants filed a motion to dismiss the Amended Complaint (ECF No. 16). Plaintiff filed a brief in opposition on September 11, 2015 (ECF No. 21) and on

---

[3] ECF No. 1.

September 25, 2015, Defendants filed a reply brief (ECF No. 24).  On October 16, 2015, Plaintiff

filed a motion for leave to file a sur-reply brief (ECF No. 25) and on October 19, 2015, an order

was entered granting this motion and deeming the sur-reply brief (which was attached as an

exhibit to the motion) as filed on that date.

Standard of Review

The Supreme Court has issued two decisions that pertain to the standard of review for

failure to state a claim upon which relief could be granted.  The Court held that a complaint must

include factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement

that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests."

Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  In determining whether a

plaintiff has met this standard, a court must reject legal conclusions unsupported by factual

allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further

factual enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted).  Mere "possibilities" of

misconduct are insufficient.  Id. at 679.  The Court of Appeals has summarized the inquiry as

follows:

> To determine the sufficiency of a complaint, a court must take three steps.
> First, the court must "tak[e] note of the elements a plaintiff must plead to state a
> claim." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868
> (2009). Second, the court should identify allegations that, "because they are no
> more than conclusions, are not entitled to the assumption of truth." Id. at 1950.
> Third, "whe[n] there are well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they plausibly give rise to an
> entitlement for relief." Id. This means that our inquiry is normally broken into
> three parts: (1) identifying the elements of the claim, (2) reviewing the complaint
> to strike conclusory allegations, and then (3) looking at the well-pleaded

components of the complaint and evaluating whether all of the elements identified
in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

The Court of Appeals has explained that: "In deciding a Rule 12(b)(6) motion, a court

must consider only the complaint, exhibits attached to the complaint, matters of public record, as

well as undisputedly authentic documents if the complainant's claims are based upon these

documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted). Thus, the

documents that Defendant has attached to the motion to dismiss (the First WF Letter, the Second

WF Letter, the Third WF Letter and the April 19, 2010 e-mail sent by Peterson) may be

considered in determining whether Plaintiff has stated a claim upon which relief may be

granted.[4]

Defendants contend that: 1) Plaintiff cannot state a claim for negligent misrepresentation

because Wells Fargo owed no duty to him as a non-customer; 2) he cannot state a claim for civil

conspiracy and concerted action because he provides no facts in support of the legal conclusion

that there was a collusive agreement between them and Benedict; 3) he cannot state a claim for

fraud because Defendants owed him no duty and because the alleged communications were not

the proximate cause of any harm he suffered and he has not met the pleading requirements of

Rule 9(b); 4) the Court lacks personal jurisdiction over Peterson, a Colorado resident, and it

cannot be established through a few letters or emails which were addressed "to whom it may

concern" and were not directed at Pennsylvania; and 5) the claims against Peterson should also

be dismissed for lack of service, as he asserts that he never received a writ of summons or a copy

---

[4] Defendants have supplied these documents as attachments to Peterson's affidavit in support of
the motion to dismiss the claims against him based on lack of personal jurisdiction.
Nevertheless, Plaintiff has not challenged their authenticity or denied that his claims are indeed
based on these documents.

of the Complaint or the Amended Complaint.

Plaintiff responds that: 1) he has properly pleaded a claim for negligent misrepresentation because, whether or not the bank had a duty to him in general, once it decided to respond to his request for information, it owed him a duty to disclose all information in its possession that it reasonably considered material to the request and to do so truthfully; 2) he has alleged enough information about the facts underlying the civil conspiracy and concerted action claims at this stage of the proceedings; 3) he has stated a claim for fraud because even if Defendants had no duty to reveal information about the Account to Plaintiff, once they undertook to answer his inquiries they assumed a duty to be truthful and their acts contributed to his injury even if they were not the sole cause; 4) the Court has specific personal jurisdiction over Peterson based either on the traditional minimum contacts test (and it does not matter whether Peterson mailed the letters himself or handed them to a courier) or based on the effects test for intentional torts when Peterson expressly aimed his tortious conduct at a Pennsylvania resident in Pennsylvania; and 5) Peterson has waived the defense of lack of service by failing to include it in his initial motion to dismiss and he was properly served with the Amended Complaint pursuant to Rule 5(b)(1) when service was made on his counsel of record.

In a reply brief, Defendants argue that: 1) Plaintiff cites no relevant authority that Pennsylvania would recognize the duty he would impose upon banks with respect to non-customers and the cases he cites are distinguishable; 2) arguing that "it is reasonably plausible for this Court to conclude Peterson and Benedict conspired and/or worked in tandem" fails to meet the standard required by Rule 9(b) and thus his fraud, concerted action and civil conspiracy claims all fail to state a claim; 3) Plaintiff cannot establish specific personal jurisdiction over Peterson based on his alleged acts because of the fiduciary shield doctrine (and no exception

applies because he is not a high-ranking corporate officer or director); and 4) Peterson was not properly served and this issue was noted in the Notice of Removal, so Plaintiff cannot claim surprise or undue prejudice.

Plaintiff filed a sur-reply brief, in which he argues that Defendants have not supported their contention that a bank that answers an inquiry by a non-customer takes on no duty to do so truthfully. But he has cited to authority from other jurisdictions that would support such a duty.

Determining State Law

The Court of Appeals has stated that:

> In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us. Kowalsky v. Long Beach Twp., 72 F.3d 385, 388 (3d Cir. 1995); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994). In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule. McKenna, 32 F.3d at 825; Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991) (in predicting state law, we cannot disregard the decision of an intermediate appellate court unless we are convinced that the state's highest court would decide otherwise).

Gares v. Willingboro Township, 90 F.3d 720, 725 (3d Cir. 1996). However, when the intermediate appellate courts and district court opinions interpreting state law provide little guidance, the court should proceed as follows:

> In predicting how a matter would be decided under state law we examine: (1) what the Pennsylvania Supreme Court has said in related areas; (2) the decisional law of the Pennsylvania intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here.

Hughes v. Long, 242 F.3d 121, 128 (3d Cir. 2001).

Because this is a diversity action, the Court must predict how the Pennsylvania Supreme Court would rule if presented with this situation. Whether a doctrine applies in this case is an

issue of law to be resolved by the court.  Bohler-Uddehom America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001).  Defendants have indicated that, for purposes of their motion to dismiss, they have assumed that Pennsylvania law applies (ECF No. 17 at 4 n.1), and Plaintiff cites Pennsylvania law.  Therefore, the Court should also apply Pennsylvania law in this case.

Count IV: Negligent Misrepresentation

Defendants argue that, because Plaintiff was not a customer of the bank, Wells Fargo had no duty to inform him about the status of the Account.  Plaintiff responds that, regardless of whether Wells Fargo had an independent duty to answer his inquiries about the Account, once it replied to his request, it assumed a duty to answer truthfully.

As recently summarized by a district court:

> Pennsylvania has adopted the Restatement (Second) of Torts § 552 governing negligent misrepresentation. See Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 890 (1994) (discussing and adopting § 552). That section provides that liability exists for negligent misrepresentation where: (1) the defendant, in the course of his business or in a transaction in which he has a pecuniary interest, supplied false information with respect to that transaction or business; (2) the plaintiff justifiably relied on the false information in making a decision; and (3) the defendant was negligent in failing to exercise the reasonable care necessary in providing the information, that is, he either knew or should have known the truth or falsity of his representation. Pennsylvania courts have determined that a lack of privity is not necessarily fatal to a party's negligent misrepresentation claim where it is shown that the defendant knew or should have known that a non-client may rely on his representations. See Bilt–Rite Contractors v. Architectural Studio, 581 Pa. 454, 866 A.2d 270, 285 (2005) ("[T]here is no requirement of privity in order to recover under § 552.").

> Negligent misrepresentation can be distinguished from intentional misrepresentation in that, to find liability for the former, the defendant need not necessarily have known that his words, when spoken, were untrue; it is sufficient to find liability that the defendant "failed to make reasonable investigation of the truth of those words." Gibbs, 647 A.2d at 890. Importantly, "[a] negligent misrepresentation claim requires an actual misrepresentation as opposed to assumptions on the part of the recipient." Partners Coffee [Co., LLC v. Oceana Servs. & Prods. Co], 700 F. Supp. 2d at [720,] 734 [(W.D. Pa. 2010)] (citing Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 561 (1999)).

State College Area Sch. Dist. v. Royal Bank of Canada, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011) (some citations omitted).

Defendants argue that a negligent misrepresentation claim "must be based on some duty owed by one party to another." Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 306 (E.D. Pa. 2008) (citing Gibbs, 647 A.2d at 890). Interestingly, however, in the Morilus case, duty or lack thereof was not at issue and in Gibbs, the court stated that "the adoption agency has assumed a duty to tell the truth when it volunteers information to prospective parents, but has failed to perform that duty." 647 A.2d at 890 (citation omitted). Thus, the lack of a preexisting duty was not determinative when the defendant assumed a duty. Moreover, as cited above, the Pennsylvania Supreme Court has more recently recognized (in Bilt-Rite) that privity is not necessary to state a claim for negligent misrepresentation.[5]

Defendants cite Bucci v. Wachovia Bank, N.A., 591 F. Supp. 2d 773 (E.D. Pa. 2008). In that case, a company president (Bucci) brought suit against Wachovia when Bucci's employee used the bank to steal money from Bucci's company by altering checks and the company's records to conceal the fraud. But the only factual allegations against the bank were that it failed to inform Bucci about the employee's actions, and since Wachovia had no relationship with Bucci, it had no duty to disclose information to him. Id. at 783. See also Abdul-Rahman v.

---

[5] In their reply brief, Defendants argue that claims based in negligence are barred by the economic loss doctrine if only economic losses are alleged. (ECF No. 24 at 7) (citing Duquesne Light Co. v. Pennsylvania American Water Co., 850 A.2d 701, 703 (Pa. Super. 2004)). The Court of Appeals has held that, in a non-product liability situation, the "gist of the action" test is "a better fit" than the economic loss doctrine. Pediatrix Screening, Inc. v. Telechem Int'l, Inc., 602 F.3d 541, 544 n.5 (3d Cir. 2010). The gist of the action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. 2002) (citation omitted). However, the gist of this action cannot lie in contract as there was no contractual relationship between Plaintiff and Defendants (as they have argued). Plaintiff is not re-casting a breach of contract claim into a tort claim and this argument is unavailing.

Chase Home Finance Co., LLC, 2014 WL 3408564, at *5 (E.D. Pa. July 11, 2014) (same);

Commerce Bank/Pennsylvania v. First Union Nat'l Bank, 911 A.2d 133, 138-40 (Pa. Super.

2006) (bank had no duty to speak to second bank about customer's check kiting scheme); Fink v.

Corporate Liaison, LLC, 2013 WL 1742474 (E.D. Pa. Apr. 23, 2013) (rejecting plaintiffs' claims

that, when they transacted business on Citibank's financial metaphorical platform, they became

"business invitees" of Citibank entitled to the same protections that such individuals receive in

the context of premises liability and that Citibank acquired a duty when it had knowledge of the

fraud committed by others); Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd., 974 F.

Supp. 822, 846-47 (E.D. Pa. 1997) (nominating bank with whom plaintiff was not in privity and

with whom he had virtually no contact did not owe the letter of credit's customer a duty of care

under a negligence theory).[6]

Defendants contend that the case of Mose v. KeyBank National Association, 464 F.

App'x 260 (5th Cir. 2012), is "on-point and instructive." In that case, the plaintiffs purchased

condominiums from Perkins Rowe, but financial problems caused Perkins Rowe to cease all

construction and ultimately the condominiums were worth far less than the plaintiffs had paid.

They brought suit against KeyBank, Perkins Rowe's lender with regard to the development

project, claiming that it had control over the sales and allowed them to occur despite its

knowledge that the project was underfunded and likely headed toward foreclosure. Because

KeyBank had no duty to disclose any information to the plaintiffs, the court dismissed the claims

of fraud and negligent misrepresentation. It is noteworthy that the court concluded that § 552 did

---

[6] Somewhat oddly, Defendants also cite Hospicomm, Inc. v. Fleet Bank, N.A., 338 F. Supp. 2d
578 (E.D. Pa. 2004), a case in which the court concluded that the plaintiff who established and
managed bank accounts for a third party was a customer of the bank or had some contractual
relationship with the bank (and therefore could proceed with breach of contract claims, but not
tort claims because the duties a bank owes its customers are created by contract).

not apply because it "requires an affirmative misstatement, not just a non-disclosure." Id. at 262 n.2 (quoting McLachlan v. New York Life Ins. Co., 488 F.3d 624, 630 (5th Cir. 2007)).[7]

In this case, Plaintiff has alleged an affirmative misstatement, not just a non-disclosure. Moreover, Plaintiff cites cases which support the proposition that a bank, even if under no duty to disclose information, may incur a duty to report accurately if it chooses to respond and the inquiring party relies upon the bank's representation to his detriment. See Ragland v. Shattuck Nat'l Bank, 36 F.3d 983, 990-92 (10th Cir. 1994) (jury properly heard evidence that the bank conveyed inaccurate information to a third party about its customer's ability to perform a contract); MSA Tubular Prods. v. First Bank & Trust Co., 869 F.2d 1422, 1424-25 (10th Cir. 1989) (bank held liable for constructive fraud for failing to provide adverse credit information when responding to a credit inquiry); Solomon Hess LLC v. Beach First Nat'l Bank, 2009 WL 2045944, at *7 (E.D. Va. July 7, 2009) (bank argued no duty to disclose, but the fraud claim was based on affirmative misrepresentations bank made, not silence; no case "[stood] for the proposition that a party can undertake to make an incomplete disclosure, allow another party to rely on the affirmatively incomplete disclosure, and then disclaim liability because it had no affirmative duty to disclose.")

In one of the first cases to analyze this issue, the Supreme Court of Mississippi held that:

> Where a bank, through one of its duly authorized officers or agents, undertakes to supply credit information, arguably gratuitously, the bank and its officers are bound to use the skill and expertise which they hold themselves out to the public as possessing. There is ordinarily no reason why factual information given by the bank should not be accurate. When a bank officer makes representations or omissions of material facts false at the time, and where that officer has not exercised reasonable care and diligence to see that the information dispensed is accurate, the bank may incur a liability.

---

[7] Similarly, the Fink case distinguished cases where liability was imposed, including fraud committed directly by employees of the bank. 2013 WL 1742474, at *3.

Berkline Corp. v. Bank of Miss., 453 So.2d 699, 702 (Miss. 1984).  See also Ostlund Chem. Co. v. Norwest Bank of Jamestown, 417 N.W.2d 833, 836 (N.D. 1988) ("While the Bank was originally under no duty to divulge any information about Glinz's credit status, we believe that once the Bank chose to reply to Ostlund's inquiry it had a duty to impart full, accurate, and truthful information."); ADL, LLC v. Tirkanian, 2010 WL 3925121, at *15 (E.D.N.Y. Aug. 26, 2010) ("[O]nce a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.")  Defendants argue that these cases are distinguishable because the banks had "long-standing" relationships with the plaintiffs therein, but cite no authority in support of this distinction.

In this case, Plaintiff has alleged that, whether or not Defendants had an independent duty to report the status of the Account to him, once they elected to respond to his inquiries, they took on a duty to be truthful and accurate, that they were not and that he relied on their misrepresentations to his detriment.  Given the case law in other jurisdictions[8] and the Pennsylvania Supreme Court's statement that privity is not required,[9] this Court predicts that, if presented with this situation, the Pennsylvania Supreme Court would hold that an individual in Plaintiff's situation could state a claim for negligent misrepresentation.  Therefore, with respect to Count IV, the motion to dismiss should be denied.

Counts I-II: Civil Conspiracy and Concerted Action

In Count I, Plaintiff alleges that Defendants acted in a civil conspiracy with Benedict and

---

[8] Defendants contend that Plaintiff provides the Court with no authority to predict how the Pennsylvania Supreme Court would rule if presented with this issue (ECF No. 24 at 2).  As explained above, however, case law from other jurisdictions does represent relevant authority when the courts of Pennsylvania have not addressed an issue.

[9] Defendants' citations to Ginnacopoulos v. Credit Suisse, 37 F. Supp. 2d 626, 631 (S.D.N.Y. 1999), and other New York cases are not on point because, under New York law, privity or a relationship so close as to approach that of privity is required.

in Count II, he alleges that they engaged in a concerted action with him. Defendants argue that both claims fail as a matter of law.

To state claim for civil conspiracy under Pennsylvania law, a plaintiff must allege: 1) a combination of two or more persons acting with a common purpose to do an unlawful act by unlawful means or for an unlawful purpose; 2) an overt act done in in furtherance of the common purpose; and 3) actual legal damage. Skipworth by Williams v. Lead Industries Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997); Kline v. Security Guards, Inc., 386 F.3d 246, 262 (3d Cir. 2004). Defendants argue that a complaint which alleges civil conspiracy "must be pled with particularity." Cunningham v. NorthVersailles Twp., 2010 WL 391380, at *5 (W.D. Pa. Jan. 27, 2010); Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009). However, it is noted that the cases they cite concern conspiracy claims under 42 U.S.C. § 1983, not Pennsylvania law.

To state a claim for concerted action, a plaintiff must allege that a defendant: 1) did a tortious act in concert with another or pursuant to a common design with him; 2) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or 3) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Burnside v. Abbott Labs., 505 A.2d 973, 982 (Pa. Super. 1985) (citing Restatement (Second) of Torts § 876).

Plaintiff contends that he has stated claims under both causes of action and that, taking his allegations as true and construing all inferences in his favor, the claims are sufficient at this time. He points to paragraphs 21, 22, 26-48 and 70-74 of the Amended Complaint as having put Defendants on notice of the type of misconduct with which he is charging them, including the

allegations that Peterson acted with Benedict when he participated in a telephone conference from his (Peterson's) office at Wells Fargo, and that Peterson sent e-mails to Plaintiff and wrote letters with fraudulent information and handed them to Benedict for delivery to Plaintiff.

Defendants argue that no alleged facts support the legal conclusion that they acted in concert with Benedict or that Peterson, on behalf of Wells Fargo, actively and intentionally sought to assist Benedict by intentionally providing inaccurate information to Plaintiff. See Mellon v. Barre-National Drug Co., 636 A.2d 187, 190 (Pa. Super. 1993) (concerted action claim failed due to lack of common plan or assistance). Contrary to this assertion, however, Plaintiff has pointed to facts that would support this claim: Peterson and Benedict called him together to state that the First WF Letter, which indicated that the Accounts funds were safe and sound, was in the mail; and Peterson handed the letters which misrepresented the amounts in the Account to Benedict to mail. Plaintiff is not required to plead when the supposed agreement was reached or what the terms of the agreement supposedly were, as Defendants contend.

Accepting Plaintiff's allegations as true at this stage of the proceedings, he has alleged facts to support the conclusion that Defendants acted in concert with Benedict and that Peterson, acting on behalf of Wells Fargo, sought to assist Benedict by intentionally providing inaccurate information about the Account to Plaintiff. Therefore, with respect to Counts I and II, the motion to dismiss should be denied.

Count III: Fraud

In Count III, Plaintiff alleges that Defendants committed acts of fraud by knowingly misrepresenting the status of the funds in the Account. Defendants argue that Plaintiff has not stated the circumstances constituting fraud with specificity as required by Federal Rule of Civil Procedure 9(b), that they owed Plaintiff no duty and that their alleged actions were not the

proximate cause of any harm he suffered. Plaintiff responds that he has sufficiently pleaded this claim, that they owed the duty once they elected to respond to his inquiries and that their acts contributed to his loss, even if the acts of others also contributed to it.

Under Pennsylvania law:

> intentional misrepresentation or fraud … contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Gibbs, 647 A.2d at 890 (footnote omitted). As explained above, the contention that a bank has no freestanding duty to report information about an account to non-customers is not relevant to the situation in which the bank actually undertakes to answer inquiries and is alleged to have done so falsely, such that an individual who relied on the bank's statements to his detriment is not precluded from stating a claim for relief. Thus, this argument should be rejected.

### Rule 9(b)

Defendants also argue that the claim requires application of Federal Rule of Civil Procedure 9(b), which states that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

The Court of Appeals has stated that:

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." Lum v. Bank of America, 361 F.3d 217, 223-224 (3d Cir. 2004). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation. See id. at 224.

Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). "Thus, Rule 9(b) requires, at a

minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1422 (3d Cir. 1997)).

In the Amended Complaint, cited above, Plaintiff has provided the who, what, when, where and how of the events at issue: Peterson, acting as agent for Wells Fargo, received and responded to three inquiries about the Account with false information, thereby inducing Plaintiff to rely on his assurances and suffer damages as a result. Thus, the argument for dismissal based on a failure to meet the requirements of Rule 9(b) should be rejected.

Proximate Cause

Defendants argue that their communications were not the proximate cause of harm to Plaintiff. Rather, they claim that Plaintiff was harmed when Benedict withdrew money from the Account.

Plaintiff responds that a defendant's actions need not be the sole cause of damages or harm so long as the defendant's conduct was one of the factual causes of the harm. In addition, Plaintiff notes that, although some of the funds were misused or diverted from the Account before the First WF Letter was sent on November 4, 2009, bank statements confirm that there was still $351,882.75 in the Account on that date when Defendants misrepresented the balance to be $600,000.00. Therefore, Plaintiff argues that Defendants' actions proximately caused him to lose those remaining funds.

Under Pennsylvania law:

> a defendant is not relieved from liability because another concurring cause is also responsible for producing injury. See, e.g., Jones v. Montefiore Hospital, 494 Pa.

> 410, 416, 431 A.2d 920, 923 (1981); <u>Hamil v. Bashline</u>, 481 Pa. 256, 266, 392
> A.2d 1280, 1284 (1978). Where a jury could reasonably believe that a defendant's
> actions were a substantial factor in bringing about the harm, the fact that there is a
> concurring cause does not relieve the defendant of liability.

<u>Powell v. Drumheller</u>, 653 A.2d 619, 622 (Pa. 1995). Plaintiff has alleged that Defendants

committed acts of fraud, resulting in damages to him, regardless of whether he was also injured

by the actions of Benedict. In addition, he has alleged that some of the funds were still

remaining in the Account at the time misrepresentations were made and thus those remaining

funds could have been saved if Plaintiff has not been misled. Therefore, the proximate cause

argument should be rejected and, with respect to Count III, the motion to dismiss should be

denied.

    <u>Personal Jurisdiction Over Peterson</u>

    Defendants contend that, pursuant to Rule 12(b)(2), the Court cannot exercise personal

jurisdiction over Peterson, a citizen of Colorado. In his response, Plaintiff concedes that general

personal jurisdiction does not apply,[10] but argues that the Court can exercise specific personal

jurisdiction over Peterson based on his acts of sending false information to him in Pennsylvania

or, in the alternative, based upon the effects test established by the Supreme Court for intentional

torts.

    "Once it is challenged, the burden rests upon the plaintiff to establish personal

jurisdiction. A nexus between the defendant, the forum and the litigation is the essential

foundation of in personam jurisdiction." <u>General Elec. Co. v. Deutz AG</u>, 270 F.3d 144, 150 (3d

---

[10] The parties misunderstand the law in this regard. General personal jurisdiction over an
individual is based on the individual's presence or domicile in the Commonwealth at the time of
service, or the individual's consent to suit, not "continuous and systematic contacts," the
standard that applies to corporations. <u>See</u> 42 Pa. C.S. § 5301(a)(1); <u>Farber v. Tennant Truck
Lines, Inc.</u>, 2015 WL 518254, at *11-12 (E.D. Pa. Feb. 9, 2015). Nevertheless, because the
parties agree that general personal jurisdiction cannot be asserted over Peterson, the Court need
not discuss this issue any further.

Cir. 2001) (citation omitted). "The plaintiff must sustain its burden of proof through 'sworn affidavits or other competent evidence.'" North Penn Gas v. Corning Natural Gas Corp., 897 F.2d 687, 689 (3d Cir. 1990) (quoting Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984)). The court initially must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff," who only needs to establish a "prima facie case," although the court can reconsider the issue "if it appears that the facts alleged to support jurisdiction are in dispute," and can conduct an evidentiary hearing to resolve any disputed facts. Carteret Savs. Bank, FA v. Shushan, 954 F.2d 141, 142, n.1 (3d Cir. 1992). See also Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

Specific personal jurisdiction arises from a defendant's forum related activities and may be established even where the defendant has not physically appeared in the state but has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985) (citations omitted). It is claim specific. Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001).

As summarized by the Court of Appeals:

> The inquiry as to whether specific jurisdiction exists has three parts. First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. Helicopteros [Nacionales de Colombia, S.A. v. Hall], 466 U.S. [408,] 414, 104 S.Ct. 1868 [(1984)]; Grimes v. Vitalink Commc'ns Corp., 17 F.3d 1553, 1559 (3d Cir. 1994). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"

O'Connor v. Shady Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (quoting Burger King, 471 U.S. at 472, 476) (footnote omitted).

The Federal Rules of Civil Procedure authorize a district court to assert personal

jurisdiction over a non-resident to the extent permissible under the law of the state where the district court sits. Fed.R.Civ.P. 4(k)(1)(A). O'Connor, 496 F.3d at 316. Pursuant to Pennsylvania's long arm statute, 42 Pa. C.S. § 5322(a), a plaintiff can establish specific personal jurisdiction by showing that a defendant has engaged in forum related activities, including "[c]ausing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth," § 5322(a)(4).

Pennsylvania also authorizes exercise of the jurisdiction of its courts over non-residents "where the contact is sufficient under the Constitution of the United States," 42 Pa. C.S. § 5308, and "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S. § 5322(b). See Kubik v. Letteri, 614 A.2d 1110, 1114 (Pa. 1992) (following Burger King analysis).

Effects Test

The Court of Appeals has indicated that, in an intentional tort case:

> we must consider whether the application of Calder v. Jones can change the outcome. Generally speaking, under Calder an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the "minimum contacts" prong of the Due Process test is satisfied.

IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259-60 (3d Cir. 1998) (citing Calder v. Jones, 465 U.S. 783 (1984)). See also Miller Yacht Sales, 384 F.3d at 96 n.2 (concluding that, because the traditional specific personal jurisdiction analysis applied, the court did not need to reach the issue of whether the effects test applied).

As the Court of Appeals has explained:

> This Court has determined that Calder allows a plaintiff to demonstrate personal jurisdiction if he or she shows:

25

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

> If a plaintiff satisfies these three elements, known collectively as the "effects test," the plaintiff can demonstrate a court's jurisdiction over a defendant even when the defendant's "contacts with the forum alone ... are far too small to comport with the requirements of due process" under our traditional analysis.

Marten v. Godwin, 499 F.3d 290, 297 (3d Cir. 2007) (quoting IMO Indus., 155 F.3d at 265-66, 259). In Marten, the court held that a Pennsylvania graduate student who alleged acts of defamation and First Amendment retaliation when he was accused of plagiarism and expelled from an internet-based educational program failed to demonstrate that the defendants' conduct was "expressly aimed" at Pennsylvania because no defamatory statements or materials were sent into Pennsylvania. But see Remick, 238 F.3d at 260 (defendants who allegedly tortiously interfered with plaintiff's contractual relations in Pennsylvania were subject to personal jurisdiction in Pennsylvania).

With respect to the allegations relating to the three WF Letters and the April 19, 2010 e-mail, Peterson states that:

> I did not mail, by overnight mail or otherwise, any correspondence to Mr. DiCio or Mr. Peter Ren. To the best of my recollection, and except as noted in paragraph 20 below, the letter(s) referred to in the Amended Complaint were handed by myself to Mr. Malcolm Benedict. Furthermore, I do not recall any conference calls in which Mr. DiCio or Mr. Ren participated.

> Although I did send two emails to Mr. DiCio and/or Mr. Ren, I did not know Mr. DiCio or any other recipient resided in Pennsylvania when those emails were sent.

(Peterson Aff. ¶¶ 19-20.) Defendants also note that the letters themselves are not addressed to anyone, but simply state "To whom it may concern." (Peterson Aff. Ex. A-1.) However,

Plaintiff has alleged that Peterson engaged in the conference call with him and Benedict and that, during the call, Peterson and Benedict assured him that the First WF Letter was being sent to him at his address in Pennsylvania. (Am. Compl. ¶ 30.) Moreover, Peterson has not explained the significance of the fact that he may have handed letters to Benedict to mail, rather than mailing them himself.

Defendants argue that a few e-mails or letters sent by Peterson to Pennsylvania are insufficient contacts to support exercising personal jurisdiction over him. However, they cite to cases involving "informational contacts" and breach of contract actions, not torts and acts in furtherance thereof. See Bolus v. Fleetwood Motor Homes of Ind., Inc., 2012 WL 3579609, at *9 (M.D. Pa. Aug. 17, 2012); Ciolli v. Iravani, 651 F. Supp. 2d 356, 361 (E.D. Pa. 2009) ("minimal correspondence"). As noted above, the Supreme Court has authorized exercising personal jurisdiction over a defendant who purposefully directs his activities at residents of the forum and the litigation arises out of or relates to those activities. Burger King, 471 U.S. at 472-73. Pennsylvania law explicitly authorizes specific personal jurisdiction over a defendant who causes harm in Pennsylvania by actions taken outside of Pennsylvania. 42 Pa. C.S. § 5322(a)(4). Accepting Defendants' argument would mean that no individual outside of Pennsylvania who engaged in tortious acts aimed at a Pennsylvania citizen in Pennsylvania could ever be subject to personal jurisdiction in Pennsylvania. This proposition is not supported by case law and should be rejected.

Peterson also invokes the "fiduciary shield doctrine," which some courts have cited to exclude jurisdictional contacts made by individuals in their official role as corporate officers. However, "[d]istrict court decisions in this jurisdiction show a split of authority on this question … [and the] issue has not been decided by the Court of Appeals for the Third Circuit."

<u>McMullen v. European Adoption Consultants, Inc.</u>, 129 F. Supp. 2d 805, 811 (W.D. Pa. 2001).

Nor has the doctrine ever been approved by the Pennsylvania Supreme Court.  <u>Hodges v. Greiff</u>,

2001 WL 34368774, at *3 (E.D. Pa. Nov. 19, 2001).  The court went on to observe that: "If the

doctrine were ever viable in Pennsylvania, however, it almost certainly is no longer in light of

<u>Calder v. Jones</u>." <u>Id.</u> (footnotes and citations omitted).

> As another court has explained:
>
> In <u>Calder</u>, the plaintiff, a California resident, sued two employees of the <u>National Enquirer</u> in a California court for a libelous article. It was not disputed that the <u>National Enquirer</u> had minimum contacts with California, but the employees, the article's author and the magazine's editor/president, argued that jurisdiction did not extend to them because they had never gone to California for the purposes of producing the article. The Court found that personal jurisdiction did extend over the employees on the basis that they were the "primary participants in an alleged wrongdoing intentionally directed at a California resident." 465 U.S. at 790. In other words, the fact that they acted on behalf of a corporation did not insulate them from jurisdiction. Rather, the Court found that they could "reasonably anticipate being haled into court" in California to "answer for the truth of the statements made in their article." <u>Id.</u> at 790.

<u>Chadwick v. St. James Smokehouse, Inc.</u>, 2015 WL 1399121, at *7 (D.N.J. Mar. 26, 2015).

Plaintiff has alleged that Peterson was the primary participant in an alleged wrongdoing

intentionally directed at him, a Pennsylvania resident.  He does not seek to hold Peterson liable

based on his employment with Wells Fargo, but based on his own actions.

Peterson cites <u>Allegheny Valley Bank of Pittsburgh v. Potomac Educational Foundation,</u>

<u>Inc.</u>, 2015 WL 1021097 (W.D. Pa. Mar. 9, 2015), but in that case Judge Kelly stated that, where

a particular defendant has no contact with the forum in the course of his alleged tortious conduct,

it cannot be said that he purposely directed his activities at the forum.  <u>Id.</u> at *8.  Here, Plaintiff

points to Peterson's contact with Pennsylvania in the course of his alleged tortious conduct.

Thus, under a minimum contacts analysis, Peterson had contacts with a Pennsylvania

resident and the state of Pennsylvania during which he is alleged to have committed acts of

fraud, negligent misrepresentation, civil conspiracy and concerted action. This is more than

sufficient to establish a prima facie case of specific personal jurisdiction over him.

Fair Play and Substantial Justice

The Court of Appeals has stated that:

> The existence of minimum contacts makes jurisdiction presumptively
> constitutional, and the defendant "must present a compelling case that the
> presence of some other considerations would render jurisdiction unreasonable."
> See Burger King, 471 U.S. at 477, 105 S.Ct. 2174; see also Pennzoil Prods. Co. v.
> Colelli & Assocs., Inc., 149 F.3d 197, 207 (3d Cir. 1998) (noting that if minimum
> contacts are present, then jurisdiction will be unreasonable only in "rare cases");
> Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir.
> 1993) ("The burden on a defendant who wishes to show an absence of fairness or
> lack of substantial justice is heavy.").

O'Connor, 496 F.3d at 324. In O'Connor, the court held that a Barbados hotel operator that had

minimum contacts based on its solicitation of a Pennsylvania resident to visit its spa, where he

was injured, did not meet the heavy burden of demonstrating that litigating the case in

Pennsylvania would offend notions of fair play and substantial justice.

The Supreme Court has identified several factors that courts should consider when

balancing jurisdictional reasonableness:

> courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the
> forum State's interest in adjudicating the dispute," "the plaintiff's interest in
> obtaining convenient and effective relief," "the interstate judicial system's interest
> in obtaining the most efficient resolution of controversies," and the "shared
> interest of the several States in furthering fundamental substantive social
> policies."

Burger King, 471 U.S. at 477 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S.

286, 292 (1980)).

In his reply brief, Peterson argues that it would be a "heavy" burden on him to travel to

Pennsylvania for trial, that he did not seek to cultivate a long-standing relationship with Plaintiff

and that he derived no benefits from his contacts with Pennsylvania. (ECF No. 24 at 14-15.)

Other than the first factor, the others cited by Peterson are irrelevant and he has not addressed the factors outlined in <u>Burger King</u>.  Although Peterson would suffer inconvenience in having to travel to Pennsylvania to litigate this case, Plaintiff's interest in convenient relief and the judicial system's interest in obtaining efficient adjudication favor a finding of reasonableness.  These interests are served by having the entire case disposed of in one forum.  Thus, Peterson has failed to demonstrate that balancing the factors leads to a conclusion that litigating this case in Pennsylvania would offend notions of fair play and substantial justice.

Moreover, even if the elements of traditional specific personal jurisdiction were not met, the effects test would apply in this situation: Peterson is alleged to have committed intentional torts which Plaintiff (a Pennsylvania resident) felt the brunt of in Pennsylvania and expressly aimed his tortious activity at Pennsylvania.  Therefore, the motion to dismiss for lack of personal jurisdiction over Peterson should be denied.

<u>Service of Process</u>

Finally, Peterson moves to dismiss this action on the ground that he never received service of the Complaint or Amended Complaint.  Peterson asserts that he never received, by certified mail, a copy of the Writ of Summons file by Plaintiff in the Court of Common Pleas or a copy of the Complaint or the Amended Complaint.  (Peterson Aff. ¶¶ 23-24.)  <u>See also</u> ECF No. 17 Ex. B (certified mail receipt dated December 3, 2014 is unsigned and USPS tracking form does not reflect that the letter and writ were delivered).

Plaintiff responds that this argument is waived because it was not raised in Defendants' previous motion to dismiss and that Peterson was served with the Amended Complaint on June 19, 2015 when Plaintiff served his counsel of record, pursuant to Rule 5(b)(1).[11]

_____

[11] Plaintiff also argues that the service of process issue is not properly before the Court because

As the Court of Appeals recently reiterated:

> The Rules impose restrictions on the filing of successive motions to dismiss: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." Fed.R.Civ.P. 12(g)(2). This "consolidation rule" is intended "to eliminate unnecessary delay at the pleading stage" by encouraging "the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense" simultaneously rather than "interposing these defenses and objections in piecemeal fashion." Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1384 (3d ed.2014).

Leyse v. Bank of Am. Nat. Ass'n, 2015 WL 5946456, at *2 (3d Cir. Oct. 14, 2015).  See also Rule 12(h)(1)(A) (a party waives a defense listed in Rule 12(b)(2)-(5) by omitting it from a motion in the circumstances described in Rule 12(g)(2)).  The court held that the defendant's second motion to dismiss fell under neither exception: it was not a motion to dismiss for lack of subject matter jurisdiction (the Rule 12(h)(3) exception) because it raised only statutory standing and it was not within the scope of Rule 12(h)(2) because it was not a Rule 7(a) pleading, a motion for judgment on the pleadings under Rule 12(c), or a motion raised at trial.  Id. at *2-3. Although the court concluded that the district court's error in allowing the second motion was harmless, it:

> emphasize[d] that district courts should enforce Rule 12(g)(2) even if their failure to do so is not a ground for reversal. Although some courts and commentators believe that allowing successive pre-answer motions to dismiss avoids delay, this seems to us like short-term thinking. In any given case, requiring a defendant to file an answer and then a Rule 12(c) motion will take more time than allowing it to file a successive pre-answer Rule 12(b)(6) motion. But over the long term, stringent application of Rule 12(g)(2) may motivate defendants to consolidate their arguments in a single pre-answer motion, especially if they know that the district court will not stay discovery while a post-answer Rule 12(c) motion is pending.

---

Defendants' motion refers only to Rules 12(b)(6) and 12(b)(2), not 12(b)(5). (ECF No. 21 at 20-21.)  Nevertheless, Defendants' brief discusses the issue and the motion cites the brief, so the Court will address the issue.

<u>Id.</u> at *4 n.5.

In this case, Defendants filed a motion to dismiss on May 29, 2015 and this motion did not raise a failure to make service argument. Rather, it raised a statute of limitations argument, a lack of personal jurisdiction argument and an argument that the Complaint failed to state a claim for negligent misrepresentation. (ECF No. 5.) When Plaintiff filed an Amended Complaint, the motion to dismiss was dismissed. Pursuant to Rule 12(g)(2) and the <u>Leyse</u> case, Defendants cannot raise in a subsequent motion to dismiss an insufficient service of process defense that was not raised in their prior motion to dismiss.

In addition, as Plaintiff observes, Rule 5(b)(1) states that, if a party is represented by an attorney, service must be made on the attorney unless the court orders service on the party. Counsel for both Defendants entered their appearance on May 22, 2015 by removing this action from state court (ECF No. 1). Thus, when Plaintiff's counsel filed the Amended Complaint on June 19, 2015, he appropriately served it on Defendants' counsel, as reflected in the certificate of service (ECF No. 11 at 18). Defendants have not responded to this argument. The Court concludes that Peterson was properly served with the Amended Complaint on June 19, 2015. Therefore, the motion to dismiss for failure to make sufficient service of process should be denied.

For these reasons, it is respectfully recommended that the motion to dismiss the Amended Complaint filed by the Defendants (ECF No. 16) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by November 18, 2015. Any party opposing the objections shall file a response by December 2, 2015. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 4, 2015